UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL EDWARD NEGETHON,

Plaintiff,

v.                                          Case No. 21-cv-0764-bhl

TIMOTHY ZACHERY WILKENS, et al.,

Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Daniel Edward Negethon, an inmate at the Oshkosh Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Fourth Amendment excessive force claims arising from officers' conduct in arresting him on January 18, 2021. Defendants Oshkosh Police Department Officers Timothy Wilkens, Michael Hendrickson, and Roberto Martinez have moved for summary judgment and that motion is fully briefed and ready for the Court's decision. For the reasons explained below, the Court will grant in part and deny in part Defendants' motion.

## BACKGROUND

On January 16, 2021, Officer Wilkens stopped a vehicle with a passenger who Wilkens later concluded was Negethon, although Negethon denies it was him. According to Wilkens, the passenger forced the driver out the vehicle and drove away. Two days later, on January 18, 2021, Officer Rasmussen (not a defendant) located the vehicle in which the passenger had fled. The vehicle was parked a few houses west of what Rasmussen believed was Negethon's last known address. While watching the vehicle, he saw a woman who was also known to live at Negethon's

last known address drive past with a male passenger. Rasmussen stopped the woman, and she told him that Negethon was at the home with two of her children. She also informed him that Negethon owned and stored a sawed-off .22 rifle at the home and had made comments about shooting, fighting, and running from officers before he would go back to prison. Dkt. No. 28-8 at ¶¶1-23.

Rasmussen notified the many officers on the scene of Negethon's whereabouts and comments. It is not clear why, but at some point, Negethon exited the home and began to walk across the street and then onto the curb. The ground was covered in snow, and the temperature was below freezing. Heavily armed officers, one of whom controlled a K9 officer, formed a semicircle around Negethon and instructed him to lower himself to the ground. Negethon responded that he could not because of a metal rod in his leg. Officers then instructed him to use the telephone pole next to him to lower himself to the ground. Negethon did not lower himself to the ground, but he kept his hands raised while he talked to crisis negotiator Officer Sopata (not a defendant) for about twenty-four minutes. Sopata tried in vain to convince Negethon to surrender himself to the police. Negethon, who knew he was going back to prison, wondered aloud multiple times if he should make the officers shoot him. He stated that he had nothing to live for and acknowledged that his option to die would be over once he surrendered. Defendants assert that Negethon stated he had a knife. Negethon denies he said that, although he acknowledges that he said he would "gut" the police dog if it attacked him so officers would have to shoot him. Dkt. No. 28-8 at ¶¶24-57.

Defendants assert that it became clear to them that negotiations were ineffective, and they began to worry about their and Negethon's prolonged exposure to the cold. Accordingly, officers began to move toward Negethon. In response, Negethon, who still had his hands raised above his head, slowly stepped off the curb and into the street. As officers advanced slowly toward hm, he

2

slowly stepped backwards. Multiple officers yelled at him to show them his hands even though his hands remained raised and were clearly visible. Without warning, Defendant Michael Hendrickson, who had been aiming a "Deuce less-lethal launcher" at Negethon during the entire interaction, shot a rubber bullet at Negethon. The rubber bullet merely grazed Negethon's coat; it did not make contact with Negethon. Negethon responded to Hendrickson shooting at him by turning and running, at which time Hendrickson shot a second rubber bullet at Negethon. Hendrickson's second shot also missed. Dkt. No. 28-8 at ¶¶58-70; Dkt. No. 34 at ¶¶15-16.

Defendant Roberto Martinez, who is K9 Officer Lando's handler and had repeatedly told Negethon he would get bitten if he did not comply with orders, released Lando and ordered him to apprehend Negethon. Negethon was able to run for a few seconds before Lando jumped up and bit him in the back. Lando quickly released Negethon, who fell to the ground and rolled on his back. Lando did not further engage Negethon, but Negethon asserts that he moved his hands to his face to protect himself from getting bitten again. About six officers ran toward Negethon. Defendant Timothy Wilkens arrived about a second before the other officers and states that Negethon was moving his hands toward his waistband and resisting officers' efforts to control his hands, so he punched Negethon twice in the face with a closed fist and kneed him once in his lower back. None of the other officers punched or kneed Negethon. After being struck, Negethon's hands were controlled, and he was handcuffed behind his back without further use of force. Dkt. No. 28-8 at ¶¶72-90.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might

3

affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of

the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party

opposing the motion for summary judgment must "submit evidentiary materials that set forth

specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932,

937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show

that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly

entered against a party "who fails to make a showing sufficient to establish the existence of an

element essential to the party's case, and on which that party will bear the burden of proof at trial."

*Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Negethon is proceeding on claims that his Fourth Amendment rights were violated when

Defendants used excessive force while arresting him. Defendants dispute Negethon's claims,

asserting that, given the totality of the circumstances, the amount of force they used was

reasonable. For the reasons explained below, the Court concludes that Hendrickson and Martinez

are entitled to summary judgment, but Wilkens is not.

**1. Negethon Was Not "Seized" within the Meaning of the Fourth Amendment When Hendrickson Fired Two Rubber Bullets at Him.**

A claim of excessive force to effect an arrest is analyzed under the Fourth Amendment.

*Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985). "A plaintiff bringing an excessive force claim must

show both that a seizure took place and that it was unreasonable." *Cabell v. Rouseeau*, 130 F.

App'x 803, 807 (7th Cir. 2005). Negethon contends that Hendrickson violated his Fourth

Amendment rights because it was unreasonable for him to fire two rubber bullets at him even

4

though Negethon was not fleeing, had his hands raised and visible, and posed no threat to the officers or others. Hendrickson contends that his conduct was reasonable because Negethon had consistently failed to comply with officers' orders to get on the ground and had suggested he had a knife that he was willing to use. Both parties, however, neglect to address the first issue: Whether Negethon was "seized" within the meaning of the Fourth Amendment.

The Supreme Court explained long ago "that there is no seizure if an officer's show of force does not either physically touch the individual or compel him to submit to the officer's authority." *Cabell*, 130 F. App'x at 807 (citing *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991)). As the Seventh Circuit has explained, "[t]his rule has led a number of circuits to conclude that no seizure took place where the officers' shots neither struck nor stopped the plaintiff." *Id.* (citations omitted) (holding that there was no seizure when none of the 105 shots fired at plaintiff's home struck plaintiff and when plaintiff did not surrender until after the firing had stopped); *see also Torres v. Madrid*, 141 S.Ct. 989, 999 (2021) (holding that officers seized plaintiff "for the instant that the bullets struck her").

Negethon does not dispute that the rubber bullets failed to make physical contact with him. In fact, he highlights that, despite Hendrickson asserting that he was fully trained with the "Deuce," he "missed [him] at only 20 yards or less." Dkt. No. 34 at ¶16. The undisputed evidence also shows that Negethon did not submit to Hendrickson's show of force but instead turned and ran in the opposite direction. Accordingly, because Negethon was not seized as defined by the Fourth Amendment when Hendrickson shot at him, he "could not have been the victim of excessive force." *Cabell*, 130 F. App'x at 807. Hendrickson is entitled to summary judgment.

**2. No Jury Could Reasonably Conclude that Martinez Violated the Fourth Amendment When He Ordered K9 Lando to Apprehend Negethon.**

Negethon asserts that Martinez used excessive force when he ordered Lando to apprehend him because, according to Negethon, he ran only because Hendrickson had shot at him. Martinez disputes Negethon's claim, explaining that it was reasonable to order Lando to apprehend Negethon because he was fleeing after nearly thirty minutes of officers ordering him to surrender and Martinez believed Negethon posed a threat to the officers.

When evaluating a claim of excessive force, the Court applies an objective reasonableness test, considering the reasonableness of the force based on the events confronting the defendant at the time. *See Horton v. Pobjecky*, 883 F.3d 941, 949-50 (7th Cir. 2018) (citations omitted). "The circumstances are viewed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Tilson v. City of Elkhart, Ind.*, 96 F. App'x 413, 416 (7th Cir. 2004) (internal punctuation and citations omitted). Further, in conducting this inquiry, the Court considers: "1) the severity of the suspected crime; 2) whether the suspect poses an immediate threat to the officer on the scene or others; and 3) whether the suspect is actively resisting or attempting to evade arrest by flight." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

According to Martinez, at the time of the encounter, Negethon was suspected of numerous serious crimes. He had multiple felony warrants for his arrest, and it had been reported that he had fled from officers just a couple days prior. Officers also had been informed that Negethon, who was on extended supervision, had a gun in his home, which he had told another person he would use to avoid going back to prison. It was also reasonable for officers to conclude that Negethon posed an immediate threat to them and himself. Negethon had made multiple threats to gut or kill Lando, which suggested that he had a knife in his possession. He also made several desperate statements about preferring death to giving up his freedom and going back to prison.

6

After numerous warnings that Lando would bite Negethon if he did not comply with orders to surrender, Martinez released Lando only after Negethon began to flee. Negethon asserts that he ran because he feared for his life after Hendrickson shot at him, but why Negethon chose to flee or Martinez's belief about why Negethon was fleeing are irrelevant to the Court's analysis. *See Tilson*, 96 F. App'x at 417 (highlighting that the Court's analysis is without regard to underlying intent or motivation). What matters is that, after nearly thirty minutes of refusing to comply with orders to surrender and after several threats against Lando and statements about preferring death to prison, Negethon ran away from officers toward the cover of his car and/or house. In light of these circumstances and given that he had a substantial head start on the officers, no jury could reasonably conclude that Martinez acted unreasonably when he ordered Lando to apprehend Negethon. *See* Dkt. No. 50, Rasmussen body camera footage at 32:00-32:30. Martinez is entitled to summary judgment.

### 3. A Triable Question Exists as to Whether Wilkens' Use of Force Was Reasonable.

Negethon asserts that it was unreasonable for Wilkens to punch him twice in the face and knee him in the back. Negethon explains that, after Lando knocked him down, he rolled on his back and raised his hands to his face to protect himself from being bitten again. Within seconds, Wilkens grabbed Negethon's arm and as other officers arrived to secure Negethon, punched him twice. Wilkens asserts that it was reasonable for him to punch and knee Negethon because he resisted Wilkens' attempts to control his hands. Dkt. No. 28-7 at ¶¶14-17.

As already noted, Negethon's underlying crimes were serious: He had outstanding felony warrants, he possessed a gun while on extended supervision, and officers believed he had evaded police just days prior. But, unlike when Martinez released Lando, Negethon was no longer fleeing when Wilkens punched and kneed him. By the time Wilkens approached Negethon, he was on his

back on the ground, and other officers arrived within moments to assist in securing him. Further, while Wilkens asserts that Negethon resisted efforts to secure his hands and reached for his waistband, Negethon asserts that he only raised his hands to his face to protect himself from Lando biting him again. Finally, it bears noting that Wilkens was the only officer who deemed it necessary to punch or knee Negethon in order to secure him; none of the other officers, all of whom approached Negethon just moments after Wilkens, used any force in their efforts to secure him. *See* Dkt. No. 50, Rasmussen body camera footage at 32:00-32:30; Scopp body camera footage at 29:30-30:00.

The Seventh Circuit has explained that "the prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon." *Alicea v. Thomas*, 815 F.3d 283, 289 (7th Cir. 2016). Further, the Seventh Circuit has repeatedly emphasized that "[p]ermitting substantial escalation of force in response to passive noncompliance would be incompatible with [the appellate court's] excessive force doctrine and would likely bring more injured citizens before our courts." *Id.* at 291 (citing *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 730 (7th Cir. 2013)). An officer may use only the degree of force which a reasonable officer would believe was required to subdue a threat. *Id.* at 290.

Negethon's factual account that he was, at most, passively resisting by protecting his face when Wilkens punched and kneed him creates a material dispute as to whether Wilkens' use of force was reasonable. Further, in light of this dispute, qualified immunity, which protects government officials from liability when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, is unavailable to Wilkens. *See id.* at 291 (citing *McAllister*, 615 f.3d 877, 881 (7th Cir. 2010)). It has long been

established that using a significant level of force on a non-resisting or passively resisting individual constitutes excessive force. *See Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) (holding that no reasonable officer could believe that punching a person who was not attempting to flee or not physically resisting was reasonable under the Fourth Amendment). Thus, granting qualified immunity to Wilkens before a jury determines to what extent Negethon was resisting when Wilkens punched and kneed him would be improper. *See Alicia*, 815 F.3d at 292. Wilkens is not entitled to summary judgment.

## MOTON FOR SANCTIONS

On July 6, 2022, Negethon filed a motion for sanctions. He asserts that Defendants failed to respond to two of his requests for documents. He notes that, as required by Civil L. R. 37, he attempted to confer with defense counsel in good faith prior to filing his motion. Defendants responded to Negethon's motion on July 11, 2022. Defendants' counsel asserts that Negethon's motion for sanctions was the first time he had heard of a complaint that Defendants' discovery responses were deficient. According to counsel, Negethon did not send a letter, call, or in any way contact defense counsel about the issues raised in the motion. Further, Defendants assert that they produced all documents responsive to Negethon's requests. Negethon did not file a reply in support of his motion.

Negethon fails to establish that sanctions are warranted. While he asserts that he attempted to confer in good faith with Defendants' counsel, he provides no details about his attempt, and Defendants' counsel asserts that he had no notice prior to Negethon's motion that Negethon had complaints about Defendants' responses. Further, according to Defendants' counsel, Defendants produced all requested documents, which consisted of nearly 6,000 pages of electronically stored information. Negethon did not rebut Defendants' counsel's evidence that Defendants fully

9

responded to Negethon's document requests.  Accordingly, the Court will deny Negethon's motion for sanctions.

## NEXT STEPS

Negethon's claim against Wilkens will proceed to trial.  Given the complexity of trying a case before a jury, including offering a coherent opening statement and closing argument, presenting and examining witnesses, and locating and introducing evidence, the Court concludes that Negethon lacks the capacity to represent himself in the next stage of litigation.  Accordingly, the Court will make efforts to recruit a volunteer lawyer to represent him.

The demand for volunteer lawyers is high, but the supply is low.  Few lawyers have the time, ability, or experience to volunteer for cases such as these.  The Court encourages Negethon to be patient as it makes efforts to recruit a lawyer to represent him.  The process may take some time.  The Court will promptly notify Negethon in the event a lawyer volunteers to represent him. In the meantime, the Court encourages the parties to explore whether settlement is possible.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Dkt. No. 27) is **GRANTED** as to Hendrickson and Martinez and **DENIED** as to Wilkens.  Defendants Hendrickson and Martinez are therefore **DISMISSED** from this action.

**IT IS FURTHER ORDERED** that Negethon's motion for sanctions (Dkt. No. 48) is **DENIED**.

Dated at Milwaukee, Wisconsin on August 4, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge